HARDY, Judge.
This is a suit in which plaintiff is seeking to recover damages allegedly sustained as the result of an automobile collision. The defendants are Midwest Dairy Products Corporation and its truck driver, one Murill O. Garner. After trial on the merits there was judgment in favor of plaintiff and against the defendants, in solido, in the total sum of $15,918.50, from which judgment defendants have appealed.
The accident occurred on June 22, 1950, at or about the hour of 6:15 a. m. at a point on U. S. Highway No. 80 some five or six *742 miles west of the City of West Monroe, Ouachita Parish, Louisiana. Plaintiff was a passenger in an automobile owned and driven hy one George W. Temple and occupied by one other young man and two young women. The five young people were students at Louisiana Polytechnic Institute at Ruston, Louisiana, and were members of a car pool designed for the purpose of transporting them from their respective homes in Monroe and West Monroe to the college at Ruston. At the time of the accident Temple was driving west on Highway 80 in his righthand lane of the said highway at a speed of some 55 miles per hour, more or less. The situs of the accident was in the vicinity of two hills and the collision occurred at or about the crest of the easternmost hill. Traveling on the highway toward the east a farm pick-up truck, driven by Huie Calhoun, was proceeding at a moderate rate of speed. This truck was followed by a large trailer truck unit, some 34 to 38 feet in overall length, belonging to the defendant, Midwest Dairy Products Corporation, and driven by its employee, Garner. Garner overtook and began the operation of passing the Calhoun truck at a point east of the hill where the accident occurred and the passing maneuver was still in progress and incompleted as the Calhoun truck and the Midwest unit proceeded almost side by side up the western slope of the hill. The Temple car topped the crest of the hill at a distance, according to the preponderance of the testimony, of some 200 to 300 feet, and the driver was confronted with what was, in effect, a veritable road block, the south lane of the highway being occupied by the Calhoun truck, which was on its proper side of the highway, and the north lane occupied by the Midwest trailer-tractor unit. Temple jammed on his brakes. At this time, according to Calhoun’s testimony, he was unaware of the passing Midwest truck but, observing Temple’s emergent action in braking his car, Calhoun deduced that some vehicle must have been approaching from his rear in the left-hand lane and immediately attempted to pull his truck onto the right shoulder of the road. Meanwhile Garner was similarly occupied in attempting to pull his unit .onto the left or north shoulder of the highway. This still left Temple in the middle of the sandwich, unalble to clear the two approaching vehicles, and he also turned onto his right hand, the north, shoulder of the highway. The collision was inevitable and the Temple car collided with the trailer portion of the Midwest unit, the rear of which was still on the highway. The front end of the Temple car was practically demolished and Temple and all of his passengers sustained injuries of some degree, the most seriously injured being plaintiff, Davis.
We find no difficulty in reaching the conclusion that the above facts were definitely established. The testimony is conclusive on the point that the easterly hill, at or about the crest of which the collision took place, was a steep eminence which effectively masked any view by drivers of vehicles on one side of the hill from vehicles approaching from the other side. It is noted that the Midwest driver testified that he had a clear and unobstructed view of some 750 feet and that he saw the Temple car approaching for some considerable distance. The trial Judge in his opinion stated quite frankly that he did not believe this testimony. We are convinced that, under the circumstances, and in consideration of the nature of the terrain, it was impossible for this driver to have had a clear view of the approaching Temple car at such a distance. In any event, the acceptance of this testimony would but increase the gross negligence with which the Midwest driver has been charged.
In our opinion there is not the slightest question or doubt, under the established facts, as to the inexcusable negligence of the driver of the Midwest unit, which we hold to be the sole and proximate cause of the accident. Nor do we find any basis under the facts which would support the charge of contributory negligence against Temple.
The Midwest driver was attempting a passing operation, in itself a dangerous maneuver, at a point, the ascending slope of a blind hill, where such an operation violated not only highway regulations but every rule of ordinary reason.
*743 The only question which gives us concern is related to the quantum of damages. Plaintiff sued for a total of $36,763.00, itemized in his petition as follows:
“Doctor Bills $1113.00
St. Francis Sanitarium 385.00
Nurses 250.00
Ambulance 15.00
Partial loss of function of left arm 5000.00
Pain and suffering 20000.00
Disfiguration 5000.00
Loss of time 5000.00”
The District Judge awarded judgment in the total sum of $15,918.50, which was comprised of the following items:
“Doctors’ bills 770.00
Nurses’ bills 250.00
Ambulance bill 13.50
Sanitarium bill 385.00
Disfiguration 1,500.00
Partial loss or injury to the left arm 3,000.00
Pain and suffering 7,500.00
Loss of time 2,500.00”
Plaintiff’s injuries comprehended a compound, comminuted fracture of the right femur, complicated fractures of the left radius and ulna, together with lacerations aibout the head and face, and general contusions.
Examination of the record discloses that adequate proof has been made of doctors, nurses, ambulance and sanitarium bills as itemized by the District Judge, with a minor adjustment on the sanitarium bill which is shown by the exhibit filed in evidence to have totaled $383.73.
In support of his allowance of $1,500.00 for disfiguration the District Judge observed that:
“Dr. Rizzo testified that it would cost ■ approximately an estimated $1,500.00 for a plastic surgeon to cure the disfigurement.”
Our study of the record does not accord with this analysis of Dr. Rizzo’s testimony. The only reference by this expert witness which we have been able to find is embodied in the following words of his testimony:
“ * * * I imagine if you get a plastic surgeon to do that, hospitalization and all will cost $700.00 or $800.00 or a $1,000.00 dollars.”
The doctor further testified that though there might be a “little correction” by plastic surgery he did not recommend it because he doubted that the amount of improvement would justify the procedure and expense.
There is no indication in the record that plaintiff contemplated seeking correction of the alleged disfigurement by plastic surgery, and, in the light of the testimony of his doctor above noted, it is questionable if such surgery would be practicable. For this reason we do not feel that we can allow any fixed sum for surgical attention which is purely speculative both as to actual performance and result. This reduces us to a consideration of the claim for damages for. disfigurement. The testimony on this point is thoroughly unsatisfactory and inconclusive. The record contains no adequate description of the scars on plaintiff’s face, and, indeed the testimony of plaintiff himself is devoid of any reference to the nature of his facial injuries. The only testimony which directly bears on this point was given by Dr. Rizzo as follows:
“Q. Well, how did his reaction tó his face— ? A. Oh, yes; I most forgot that, he did have a laceration on his face, particularly over the forehead and the right side and the eyelid. There is some scar there that will be permanent and a slight disfigurement on the face. I had overlooked that.”
There would be no justification for a substantial award for damages on the basis of such vague, inconclusive and unsatisfactory evidence. Accordingly we think an allowance of nominal damages in the sum of $100 would be the most that might be expected.
The injury to the left arm, though serious and painful, has apparently left little permanent limitation of its use. The only resultant difficulty which will be experienced by plaintiff is the motion of turning the left hand at the wrist joint, which limitation was fixed at about 2% by the medical testimony. Plaintiff himself frankly and fairly testified that he could not say *744 with certainty that this slight, limitation would interfere with any work in which he might engage. As a consequence we can only conclude that the allowance of $3,000 was excessive and should be reduced to $1,000.
Turning to a consideration of the allowance for pain and suffering we find that plaintiff was confined to the hospital for some two weeks following the accident; was forced to use a wheelchair for some five or six weeks, and thereafter found it necessary to use the aid of. crutches for some five months. Plaintiff underwent three separate operations in the course of treatment and was subjected to the administration of a general anaesthetic on four occasions. Unquestionably the serious nature of the fractures sustained by plaintiff caused considerable pain and suffering during the process of treatment and the course of his convalescence. The only testimony as to pain and suffering was that of plaintiff himself and we quote below his complete testimony on direct examination which bears upon this item:'
“Q. How long were you actually confined to. your home after leaving the Sanitarium? A. After I left the Sanitarium it was about five weeks I would say that I couldn’t move around much because my arm was in a cast and my leg was bunged up, and I could get up and sit in a wheel chair with help though. Now, after the cast was removed from my arm, which was about five weeks after I left the hospital, and after my arm regained strength which was, I would .say it was about two weeks, by exercising it constantly, I was able to move around on crutches at that time.
“Q. And how long did you stay on crutches? A. Well, I stayed on crutches, I don’t know exactly the date that he let me walk without the crutches but I think it was around the last of November if I am not mistaken.
“Q. How many times were you put under ether or an anaesthetic ? A. Well, I was put under anaesthetic four times.
“Q. For what purpose?
“Mr. Thompson: That is objected to, the Doctors have testified.
“The Court: I think it is admissible but is repetition.
“Q. Did you suffer any during this time? Was it painful? A. Well, I will say that about the first two months it was painful, and after that time it was well painful if I did anything wrong, roll over in bed the wrong way or anything like that and very discomforting, and then when I first started walking it was very painful for about I would say three weeks, I couldn’t hardly walk at all, my leg just pained me so bad, and then after that when I started to Tech this last semester, it was painful any time I would climb a stair or anything like that, and after that, after the rod was taken out, well the incision was painful for a while but other than that it was all right.
“Q. Can you use your left arm now? A. Yes, sir; I can use my left arm, I can’t turn it completely over with the palm toward the ceiling but I can use it other than that.
“Q. What course of study are you taking? A. Chemical engineering.
“Q. In that profession would you necessarily have to use that arm lifting up objects and stuff of that kind? A. I would say I would always have to use my hand as long as I have got it but I don’t know whether it would be exactly a requirement for that field or not, since it is an engineering profession, but I may have to use that hand, it is according to what type of work I do. I don’t know what type I will do yet.
“Q. When was the last operation, in other words, when was the pin taken out? A. It was Saturday, a week ago.
“Q. Is it still painful ? A. At this time, No, sir.”
There is no satisfactory rule or measure by which courts are able, with any certainty or accuracy, to fix a proper *745 monetary award for pain and suffering. We are cognizant of the fact that no amount of money can compensate the imponderable damages which are represented by pain and suffering. The measure of-pain is in itself dependent in some considerable degree on the nature of the individual involved, some being more susceptible to pain than others. The nature of the injuries, of course, .is somewhat of a guide. Taking all these factors into consideration,. and relying upon the testimony of plaintiff, we conclude that the allowance on this item was excessive and, accordingly, it is reduced to the- sum of $4,000.
 The final item claimed by plaintiff, and on which he was allowed the sum of $2,500 in the judgment below, relates to the alleged “loss of time”. The only “loss of time” sustained by plaintiff was his enforced absence from his school work over a period of two semesters, that is, the summer and fall of 1950. Again, the only testimony on this point was that of plaintiff who testified that the effects of the injuries sustained in the accident delayed him one year in the completion of his college education “if everything had come as planned”.
No effort was made by plaintiff or on his behalf to establish any real damage in this connection. There is no showing that plaintiff could or would have undertaken remunerative employment after his graduation, nor that he suffered any loss of prospective employment or opportunity therefor by reason of the enforced delay. Indeed, the fact of his graduation is purely speculative and subject to the qualification above noted in plaintiff’s own words. In short, we have absolutely no basis upon which to make any award. Loss of time, per se, is not compensable unless it is directly connected with some loss of advantages, benefits or revenues which might have been produced by the profitable use and employment of such time. It follows that this item should be disallowed in its entirety because of lack of proof.
For the reasons set forth the judgment appealed from is amended by reducing the amount thereof to the sum of Six Thousand Five Hundred Seventeen and 23/100 ($6,-517.23) Dollars, and, as amended, it is affirmed at appellant’s cost.
McINNIS, Judge ad hoc, sitting.
KENNON, J., not participating.